UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JUDY ARNOLD,                                    :        Case No. 1:12-CV-460
                                                :
        Plaintiff,                              :
vs.                                             :
                                                :
CINCINNATI SPORTSERVICE, INC.,                  :
                                                :
                        Defendant.              :

## ORDER

Before the Court is Defendant's motion for summary judgment.  (Doc. 20)  Plaintiff

opposes the motion (Doc. 23), and Defendant filed a reply brief.  (Doc. 24)  Plaintiff alleges that

Defendant discriminated against her on the basis of her age when it did not promote her, and

retaliated against her by reducing her hours after she filed an initial charge of discrimination with

the United States Equal Employment Opportunity Commission.  For the reasons that follow, the

Court will grant Defendant's motion.

## FACTUAL BACKGROUND

On June 6, 2012, Judy Arnold filed this action against Cincinnati Sportservice, Inc.

(Sportservice) under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623.

Arnold, a 68 year-old female, was employed by Sportservice as a special events coordinator

from approximately April 2005 to September 2012 when she resigned.  Sportservice is the

exclusive concessions, premium dining, and retail provider for the Great American Ballpark

(Ballpark), where it employs 1,250 part-time associates.  (Noel Decl. ¶ 1)  The Cincinnati Reds

are Sportservice's main client, but Sportservice also serves the public through its special events

catering services. (Noel Decl. ¶ 1)

Prior to working for Sportservice, Arnold had over twenty years of experience in the food and beverage industry.  (Arnold Dep. at 67)  Arnold's resume shows that since 1996 she held various management positions in the industry.  (Dierig Dep. Ex. 5)  She was a food and beverage supervisor at the Grand Victoria Casino and Resort and at the Argosy Casino.  She was also a restaurant manager at the Belterra Casino.  At Argosy, her responsibilities included managing six supervisors, staffing, scheduling, training, contract issues, inventory control, equipment maintenance, and interaction with vendors.

In 2005, Arnold was hired by Sportservice as a special events coordinator and was offered a full-time position.  (Arnold Dep. at 26)  However, she had another part-time job, so she asked to only work part-time.  Her supervisor, Jeff Shanor (Shanor), was the Food and Beverage Director and Catering Manager at the time she was hired.  (Id. Ex. 11)  Shanor agreed to set her schedule at 30 hours per week.  (Id. at 76)  Arnold was initially hired as a seasonal employee, but later Shanor told her that she would work year-round.  (Id. at 27)  Arnold's employment was part-time and year-round throughout her employment with Sportservice.  (Id. at 75)

In an email that Arnold sent to Don Dierig, Sportservice's General Manager, on May 15, 2011, Arnold explained that her duties as a special events coordinator included preparing menus, client relations, scheduling event staff, generating banquet event orders, interacting with clients, and working with the Reds managers and staff in planning events.  (Id. Ex. 11)  Arnold did not manage any staff on a day-to-day basis but was a supervisor for some special events.  (Id. at 37)  Arnold had the authority to discipline employees at these special events at the Ballpark.  There is no evidence of complaints about Arnold's performance when she worked under Shanor.  Based on fifty working weeks per year, with two weeks of vacation, Arnold calculates that she worked approximately 32 hours per week in 2009 and 35.1 hours per week in 2010.  (Id. at 122)

Sometime prior to January 2010, the Reds requested that Sportservice create a new position of Catering Manager, which would focus on special event catering. (Dierig Dep. at 27) That new position was to be a full-time, year-round, hourly position. (Id.) Sportservice posted the Catering Manager position on careerbuilder.com's website and in a binder kept in the company's office. (Arnold Dep. at 60) The posting included a job description and requirements including management of the catering program, evaluating staff performance, coordinating schedules, meeting with clients and potential clients, ordering, and maintaining inventories. (Id. Exs. 12 and 13) Three to five years of prior catering and management experience were required as well as experience in catering functions for up to 500 people. Arnold had performed all of the functions and responsibilities listed on the job posting.

Dierig, in his role as Sportservice's General Manager, oversaw operations at the Ballpark for Sportservice and was Shanor's supervisor. He was also responsible for hiring the Catering Manager. Dierig testified that, in addition to the written job description's requirements, he required that the new Catering Manager have management experience at the Ballpark, significant prior interaction with the Reds, and a positive attitude. (Dierig Dep. at 89-90) These requirements first appeared in print in Sportservice's position paper submitted to the EEOC on September 26, 2011. (Id. Ex. 3) Dierig also testified that the Reds asked him to not hire someone from Shanor's team as the Catering Manager (this only included Arnold) because they did not like Shanor's attitude and lack of "can do" spirit. (Id. at 30-31) Arnold asserts that she met all of these additional requirements because she had significant prior interaction with the Reds, had a positive attitude, and had management experience at the Ballpark. (Arnold Decl. ¶ 4-6) However, she had worked for Shanor and would have fallen within that restriction, if there was one. (Arnold Dep. at 32)

Arnold applied for the Catering Manager position and was interviewed in February 2010 by Dierig and Ashley Noel, the Human Resources Manager.  Dierig testified that he did not hire Arnold because she had worked for Shanor.  (Dierig Dep. at 38)  He also believed Arnold was not qualified for the job because she was "introverted" and had "no managerial experience at the Ballpark."  (Id. at 37-38)  Arnold was not informed that the Reds had told Dierig not to hire someone from Shanor's team.  (Id. at 37)  Dierig testified that he did not believe Arnold was qualified before her interview, and that he only interviewed her because he had an "unwritten rule" to interview all internal applicants to help maintain morale.  (Id. at 36)  The Reds did not participate in the interview, and there was no communication with the Reds about hiring Arnold.  Arnold was not hired for the position, was not informed of the decision, and was not told why Sportservice did not hire her.  (Id. at 43)

In approximately March 2010, the position was offered to a much younger woman, but she declined the position.  (Id. at 49)  Dierig decided to fill other positions and put the hiring of the Catering Manager on hold.  (Id. at 52)  The position was not filled until August 2011.

In January 2011, Shanor was transferred to a different city, and Dierig assigned a portion of Shanor's old responsibilities to Arnold.  The remainder of Shanor's responsibilities, such as billing and keeping track of small wares and product, were assigned to Lon Callis.  Callis was a manager at one of the restaurants in the Ballpark.  (Id. at 61-62)  Arnold continued managing her normal responsibilities and some of Shanor's old responsibilities until May 2011.  On May 15, 2011, Arnold emailed Dierig to express her continued interest in the Catering Manager position.  (Arnold Dep. Ex. 11)  In her email, Arnold outlined her normal responsibilities as well as the additional duties she had taken on when Shanor left.  These additional duties included preparing quotes for events, working closely with the Reds' Special Events team, handling a significant

increase in the number of events on her schedule, creating forms, attending client meetings, and contributing to meetings with the Reds' Special Events team, and creating a photo folder of special events.  Dierig never responded to this email.  (Dierig Dep. at 67)  He testified that he reached out to "corporate" to decide what to do with the email but does not remember who he talked to or what they said.  (Id. at 68)  Arnold also asked Shanor to write her a letter of recommendation for the position, which he wrote on May 16, 2011.  (Arnold Dep. at 65, Ex. 14)  Arnold never gave the letter to Sportservice.  Dierig testified that he did not personally witness Arnold's work and would not comment on whether it was satisfactory during this time period.  (Dierig Dep. at 63)  There is no evidence of any complaints about Arnold during this period.

In May 2011, Suzanne Klick (Klick) transferred to Cincinnati from a different Sportservice location.  She became the food and beverage manager, the position that Shanor previously held, and assumed most of its responsibilities.  (Klick Dep. at 7)  Arnold began directly reporting to Klick in May 2011 and relinquished her additional duties to Klick at that time.  On May 2, 2011 the Catering Manager position was reposted on careererbuilder.com. (Arnold Dep. Ex. 15)  It was also posted internally by early June 2011.  (Id. at 111)  Internal postings are usually sent to all employees through email notification when a management level position is posted, but Arnold never received an email about this posting.  Later in June 2011, there was a second round of interviews for the Catering Manager position conducted by Dierig, Klick, and Noel.  Arnold was not interviewed.  (Id. at 60)  In July 2011, the position was offered to and accepted by Carly Meyer (Meyer), a 26 year-old female who was interviewed by Klick and Noel.  (Meyer Dep. at 6)  Arnold began directly reporting to Meyer starting in September 2011.  (Klick Dep. at 10)  On August 15, 2011, Arnold asked Klick why she was not considered for the Catering Manager position, and Klick told her that the Reds wanted "fresh eyes" for the

position.  (Arnold Dep. at 40)  Klick never explained to Arnold what the Reds meant by "fresh eyes."  Klick also told Arnold that she had not been considered because she had failed to respond to the posting when it was reopened.  (Id. at 111)

At the time she was hired for the Catering Manager position, Meyer had been the manager of the Champions Club since January 2010.  (Meyer Dep. at 6)  The Champions Club is the largest Sportservice venue at the Ballpark by area and capacity.  (Arnold Dep. at 34)  It is also the most complex of the four clubs operated at the Ballpark because of its capacity and the variety of different events held there.  (Dierig Dep. at 91)  Prior to becoming manager of the Champions Club, Meyer was an assistant manager/supervisor for the Champions Club from 2009 to 2010 and had worked part-time at the Ballpark with Sportservice from 2006 to 2009.  (Meyer Dep. at 5)  When asked why he chose to hire Meyer, Dierig described her as having strong interpersonal and operational skills.  (Dierig Dep. at 85)  He also stated that Meyer had received complimentary feedback from the Reds during her time working at the Champions Club.  (Id. at 90)

On August 23, 2011, Arnold filed a charge of discrimination with the EEOC, alleging that the failure to promote her to the position of Catering Manager was based on her age.  (Arnold Dep. at 79)  Dierig was informed of the charge by a letter and fax from Arnold's attorney the same day.  (Arnold Dep. at 78; Dierig Dep. Ex 9)  During a meeting on September 1, 2011, Klick informed Arnold that Arnold's hours would be reduced to 25-30 hours per week.  (Arnold Dep. at 76)  Klick and Meyer told Arnold her hours were cut because it "was what [Arnold] was originally hired for."  (Id.)  Noel testified that both seasonal part-time and year-round part-time employees' hours were reduced at the end of the 2011 baseball season, and this included Arnold.  (Noel Dep. at 68)  Arnold protested this reduction in hours because she was

originally hired to work 30 hours per week, year-round by Shanor.  (Arnold Dep. at 76)  Two weeks later, Klick told Arnold that her hours would be limited to exactly 25 hours per week.  (Id. at 79)  Klick determined that they only needed 25 hours per week from Arnold's position because they had hired a Catering Manager.  (Dierig Dep. at 113)

       Arnold had no evidence at the time her hours were reduced that either Klick or Meyer knew about her EEOC charge.  (Id. at 78)  However, Sportservice's supplemental submission to the EEOC indicates that Klick was informed of the charge on August 23, 2011.  (Dierig Dep. Ex. 10)  Klick could not recall whether she saw or heard of the EEOC charge on that date.  (Klick Dep. at 16)  Arnold believed the reduction in her hours was in reaction to her complaint but did not explain why she believed this.  (Arnold Dep. at 78)

       Arnold has also identified two other incidents at Sportservice which she alleges were discriminatory.  The first was in 2006, when a photograph of her and another older woman labeled "Golden Girls" appeared in a company newsletter written by Jim Abbott.  (Id. Ex. 4)  Abbott was a Sportservice employee who often wrote the newsletter, but he was never Arnold's supervisor nor was he involved in the process of selecting the Catering Manager.  (Id. at 51, Ex. 4)  Arnold did not report or complain about the newsletter at the time it was distributed.  (Id. at 51)  The second incident was November 2011, when Marie Dozier, the Cincinnati Sportservice Controller, sent an email to all Ballpark Sportservice employees with the subject "The next generation," and attached a photograph of five employees that were substantially younger than Arnold.  (Id. Ex. 2)  Dozier was not Arnold's supervisor, and there is no evidence that she was involved in the hiring of the Catering Manager.

       After her hours were limited and Meyer was hired, Arnold was uninvited to many staff meetings, and to meetings with the Reds and with other clients that she had typically attended in

the past.  (Id. at 162)  Arnold did not know why she was uninvited but never asked why.  (Id. at

163)  Klick testified that Meyer had taken over the responsibility of meeting with clients because

Sportservice wanted a single point of communication with clients. (Klick Dep. at 9, Arnold Dep.

at 93)  Later, Klick told Arnold to cut off all communication with clients and to refer them

directly to Meyer.  (Arnold Dep. at 176)  In late 2011, Arnold was not invited to a year-end party

to which "all core employees" were invited.  (Id. at 156)  In December 2011, Arnold did not

receive a Christmas card or Visa gift card from Dierig as she had in the past. (Id. at 174)  Arnold

witnessed other employees receiving cards but did not know if every employee received one.

(Id.)

In a letter dated March 6, 2012, Noel told Arnold:

> [A]s you know, right now there is very little work in your position
> as part-time Administrator/Supervisor to the Catering Manager and
> that situation will continue until the new season begins effective
> March 15, 2012. Therefore, based solely on the requirements of
> your current position you would be laid off, with a return date of
> March 15, 2012 when the current season begins. However, during
> the next 9 days we wanted to offer you the option to take on
> additional duties as assigned by management to supplement the
> hours working in your current position. This would allow you to
> avoid a seasonal layoff this March 2012.
> ***
> Please understand that your current position is part-time and your
> hours are based on business needs. Nothing herein guarantees that
> you will not be subject to a seasonal layoff in any other year.

(Arnold Dep. Ex. 18)  Arnold believed that seasonal layoffs were used to terminate employees,

but she could not identify a time when Sportservice had done so in the past.  (Id. at 143)  Arnold

chose to continue working in other positions to avoid the layoff and worked 25 hours per week

for that time period.  (Id. at 140)

On September 20, 2011, all employees had been sent a memorandum stating that a

discipline policy would be implemented for any employee who exceeded their allotted hours for

the week without supervisor permission.  (Id. Ex. 10)  On July 2, 2012, Arnold went over her allotted 25 hours per week by 23 minutes and was issued a written warning.  (Arnold Dep. at 196 and Ex. 26)  The written warning placed her in corrective counseling but stated that Arnold would be removed from counseling if she had no further incidents for six months.  (Arnold Dep. Ex. 26)  Meyer also issued a verbal warning to Arnold on July 27, 2012 after Meyer received complaints regarding two events that Arnold coordinated.  (Id. at 30)  Arnold said that the complaints for one event were that the clients received pretzels instead of snack mix and the drinks ran out early.  The other event was set up half an hour late and the pretzels arrived over an hour late.

On September 8, 2012, Arnold filed a second EEOC charge alleging that Sportservice reduced her hours in retaliation for filing her initial EEOC charge.  By this time, Arnold believed Sportservice had become a hostile work environment and that she was being set up to fail. (Arnold Dep. at 133)  During her employment at Sportservice, there were only two other employees that were close to Arnold in age, and Arnold believed Dierig was uncomfortable around all three of them.  (Arnold Dep. at 84)  Arnold submitted a letter of resignation on September 19, 2012.  (Id. Ex. 17)  Arnold did not explain her reason for leaving in the letter. Upon resigning, Arnold found employment at Mother of Mercy High School in its cafeteria for 20 hours per week during the school year.  She has also worked at the US Bank Arena during the hockey season and sporadically at the Bank of Kentucky Arena.

## ANALYSIS

### Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  An assertion of undisputed fact must be supported by citation to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of his pleading, but…must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, … or is not significantly probative, … the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence and draws all reasonable inferences in favor of the non-moving party.  Martin v. Cincinnati Gas & Elec. Co., 561 F.3d 439, 443 (6th Cir. 2009).

Age Discrimination Claim

Arnold has no direct evidence of age discrimination and relies on indirect evidence.  Where there is no direct evidence of discrimination, the claim is analyzed under a three-part, burden-shifting test.  See McDonnell Douglass Corp. v. Green, 411 U.S. 793, 793 (1973).  First, the plaintiff must establish a prima facie case of discriminatory failure to promote; the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the failure to

promote; finally, the plaintiff must prove that the legitimate, non-discriminatory reason offered was mere pretext for unlawful age-discrimination.  Bender v. Hecht's Dep't Stores, 455 F.3d 612, 622-23 (6th Cir. 2006).

      To make out a prima facie case of age discrimination under the ADEA for a failure-to-promote claim, Arnold must show (1) she was at least 40 years old when she applied, (2) she was qualified for the promotion, (3) she was considered for and denied that promotion, and (4) a substantially younger person was given the position.  Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009).  Arnold was 68 years old when she applied for the promotion, was interviewed for and denied the promotion, and a 26-year-old female was offered the position.  Thus, the only element in dispute is whether Arnold was qualified for the promotion.  A plaintiff must simply demonstrate that she met an employer's objective qualifications to satisfy this prima facie burden.  Id. at 585.  "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).  The prima facie burden is not intended to be onerous, and may be satisfied with evidence that her "qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field."  Id. at 575-76.

      Here, Sportservice listed some of the responsibilities and requirements of the Catering Manager position on careerbuilder.com and in a binder in its office.  It is uncontested that Arnold met all of these requirements.  However, Sportservice contends that it relied on other criteria: significant interaction and communication with the Reds organization; managerial experience at the Ballpark; and a positive, "can-do" attitude.  Sportservice maintains that Arnold was not qualified because she lacked these criteria.  Arnold asserts that she met all of these

unwritten requirements.  Arnold had supervised special events at the ballpark many times in the past and had been given permission to discipline employees if needed.  She also attended and contributed to meetings with the Reds organization while working under Shanor and while she handled some of Shanor's responsibilities after he transferred.  Viewing the facts in a light most favorable to Arnold, she met these two objective requirements.

Dierig also claims that the Reds told him to not hire anyone who had previously worked for Shanor , and Arnold was the only one who had done so.  The disqualification of anyone who had worked under Shanor was allegedly to ensure that the successful candidate had a positive, "can-do" personality.  Arnold maintains that she is a "can-do," positive person and is not introverted.  (Arnold Decl. ¶ 4-6)  Dierig and others at Sportservice disagree with Arnold's description of her personality.  However, they did not provide concrete examples of her lack of enthusiasm or her introverted personality.  The Sixth Circuit has typically given close scrutiny to subjective requirements such as a "can-do personality."  See Grano v. Dep't of Development, 699 F.2d 836, 837 (6th Cir. 1983) ("[T]he legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority").  Given that the burden of proving a prima facie case of discrimination is not an onerous one, Arnold was objectively qualified for the position.  Viewing the facts in a light most favorable to Arnold, she has sufficiently alleged a prima facie case of age discrimination.

Sportservice must then "articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  Sportservice states that the position was offered to Meyer because she was the best qualified applicant for the promotion.  Choosing the best-qualified candidate for a promotion is a legitimate non-discriminatory reason.

Jones v. Memphis Light, Gas & Water Div., 346 F. App'x 38, 43 (6th Cir. 2009) (unpublished).

Therefore, Arnold must come forward with evidence that the reason offered by Sportservice was

a mere pretext for unlawful age-discrimination.  Bender, 455 F.3d at 626.  Arnold may prove

pretext by demonstrating that the stated reason (1) has no basis in fact, (2) did not actually

motivate Sportservice's challenged conduct, or (3) was insufficient to warrant the challenged

conduct.  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  The

Sixth Circuit has made it clear that it has "… never regarded those categories as anything more

than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the

employer [fail to promote] the employee for the stated reason or not?' "  Tingle v. Arbors at

Hilliard, 692 F.3d 523, 530 (6th Cir. 2012).  It is Arnold's burden to produce "sufficient

evidence from which the jury could reasonably reject [Sportservice's] explanation and infer that

[Sportservice] intentionally discriminated against [her]."  Johnson v. Kroger Co., 319 F.3d 858,

866 (6th Cir. 2003).

Sportservice argues that Arnold cannot show that its reason was false or lacks any basis

in fact because she cannot show that she was significantly more qualified than Meyer.  Superior

qualification is not the only factor at issue here.  In failure-to-promote cases such as this, the

plaintiff may demonstrate that she was as qualified or better qualified for the position *as well as*

present other, probative evidence of discrimination.  Bender, 455 F.3d at 626.  But, when there is

little or no other evidence of discrimination, "the rejected applicant's qualifications must be so

significantly better than the successful applicant's qualifications that no reasonable employer

would have chosen the latter applicant over the former."  Id. at 627.

In Bender, summary judgment for the employer was affirmed because the plaintiff's

qualifications were merely comparable to that of the other applicant, and the plaintiff provided

insufficient additional evidence of discrimination.  Hecht's Department Stores was restructuring and terminated many of its employees.  However, the company attempted to reassign terminated employees to other open positions in the company.  There was one remaining executive position open for reassignment, and it was given to 39-year-old Terry Patton instead of 55-year-old James Rafferty.  Rafferty claimed the decision was based on age discrimination.  He argued he was more qualified for the position because he was more senior at the company, received the highest scores on the most recent employee review, and had eight years of experience in the same executive position at a different location.  In contrast, Patton received the highest reviews on average over a longer period of time, and his supervisors attested to his understanding and implementation of an important merchandising system.  The court determined that if two reasonable decision makers could consider two candidates' qualifications and arrive at opposite conclusions, then obviously one candidate's qualifications are not significantly better than the other.  Id. at 628.  This was true of Rafferty and Patton.  Id.  Rafferty offered no evidence of any current or historical discrimination at Hecht's and relied almost entirely on the fact that Patton was younger.  Because Rafferty provided no concrete evidence of discrimination or a discriminatory environment at Hecht's, the court of appeals affirmed summary judgment in favor of Hecht's.  Id.

In contrast, in Jenkins v. Nashville Public Radio, 106 F. App'x 991 (6th Cir. 2004) (unpublished), the Sixth Circuit reversed the summary judgment granted to defendant.  Jenkins, an African-American woman, was denied a promotion to Director of Marketing at Nashville Public Radio (NPR).  The president, Gordon, offered the job to Surface, a Caucasian male.  NPR argued that Surface was chosen because he had more experience supervising staff.  Jenkins alleged that she was more qualified for the job because her degree was in a relevant field while

Surface's was not, and that, contrary to NPR's assertion, she had significant fundraising experience.  Jenkins also presented evidence of inconsistencies in the hiring process that reflected racial and gender discrimination.  Jenkins' superior testified that she was interviewed only as a courtesy and that he knew prior to the interview that he would not promote her and had already decided to hire Surface.  Others involved in the selection process offered different and inconsistent reasons for not hiring her.  Finally, Jenkins presented evidence that there were no African-American women in management roles at NPR during Gordon's entire tenure at NPR.  The court held that this evidence, coupled with her qualifications, could lead the trier of fact to conclude that NPR denied her the position because of her race.  Id.  Thus, the summary judgment in favor of NPR was reversed.

Here, viewing the facts in the light most favorable to the plaintiff, it appears that Arnold's qualifications were at least comparable to those of Meyer.  Both had some managerial experience at the Ballpark and met the other written job requirements.  Though Meyer had received complimentary feedback from the Reds and managed the most complex club at the Ballpark, Arnold had more managerial experience at previous jobs and more experience with special events at the Ballpark.  When considering the prior job experience of the two candidates and the written requirements, it appears that reasonable minds could have arrived at opposite conclusions as to which candidate to hire.  As in Bender and Jenkins, neither candidate was significantly better than the other.

Therefore, this Court must ascertain if there is sufficient additional evidence of discrimination.  Arnold has no evidence of organization-wide hiring discrimination on the part of Sportservice.  She does not present any statistics or evidence that there was a lack of managers or supervisors from a protected class.  She merely states that there were only two other

employees around her age and that Dierig seemed uncomfortable around her.  Arnold also cites

two isolated incidents as suggestive of a discriminatory environment at Sportservice, but the two

employees who published the email and newsletter were not involved in the hiring process.  See

Griffin v. Finkbeiner, 689 F.3d 584, 595 (6th Cir. 2012) (holding that racially insensitive

remarks by an African-American's supervisor are evidence of animus only if they have some

connection to the employment decision).

Arnold has identified anomalies in the hiring process that she argues establish that

Sportservice's reason is pretextual.  Dierig testified that Arnold was only interviewed to help

maintain morale; he admitted that he believed Arnold was not qualified for the job before he

interviewed her.  Sportservice maintains that Dierig believed this because the Reds did not to

want Sportservice to hire anyone from Shanor's team.  Arnold argues that this and other alleged

job requirements were not in writing, but that alone does not rebut the validity of the

requirement.  Cf. Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987) (holding that an employer

can consider factors external to a job description when selecting among qualified candidates).

Arnold notes that the position was offered to substantially younger women on two separate

occasions but, as in Bender, this is not enough to establish pretext.  Finally, Arnold relies on

Dierig's failure to respond to her May 15, 2011 email about her continued interest in the job

opening, and her allegation that she did not receive an email notifying her that the position had

been formally reposted.  Arnold has no evidence that an email notification was sent to any other

Sportservice employee, and Dierig's failure to respond does not in itself raise a suspicion of

discrimination.  These purported anomalies, individually or collectively, are not sufficient to

raise a reasonable inference that Sportservice's proffered reason was pretextual.  Arnold falls

short of providing tangible examples of a discriminatory hiring process.  See Tingle, 692 F.3d at

531 (finding no pretext where the plaintiff "offer[ed] no evidence, beyond her own assertions," that the defendant's actions were discriminatory),  Bender, 455 F.3d at 628 (holding that, without statistical or historical evidence of discrimination, the plaintiff could not prove pretext), Ross v. Campbell Soup Co., 237 F.3d 701, 708 (6th Cir. 2001) (plaintiff was more than qualified to perform his job, and submitted evidence of his favorable performance reports; his employer's justification for terminating him (that he was not qualified) was rebutted by employer's unexplained increase in his sales quotas, an invitation to retire, and several references to plaintiff's work-related back injury, and created a triable issue of pretext).

The Court concludes that Arnold has not established a genuine factual dispute about whether Sportservice's stated reason for not promoting her was pretextual.  Summary judgment on the discrimination claim is therefore granted.

Retaliation Claims

Arnold relies on indirect evidence to support her retaliation claims, and they are analyzed under the same burden-shifting framework.  Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008).  To establish a prima facie case of retaliation under the ADEA, Arnold must show: (1) she engaged in a protected activity, (2) Sportservice had knowledge of this activity, (3) Sportservice took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse action.  Id.

Arnold alleges that Sportservice took an adverse employment action when her hours were reduced; she alternatively claims, that she was constructively discharged.  Sportservice argues that Arnold's prima facie case fails because there was no material adverse employment action taken against Arnold, and that Arnold's voluntary resignation was not a constructive discharge.

A materially adverse employment action in the retaliation context may consist of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). Adverse employment actions may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 594 (6th Cir. 2007) (quoting Ford v. General Motors Corp., 305 F.3d 545, 553 (6th Cir.2002)). The burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the discrimination context. Burlington Northern, 548 U.S. at 57.

In Burlington Northern, the Supreme Court held that a 37 day suspension without pay constituted an adverse employment action, even though the employer eventually reversed the decision and gave the plaintiff back pay. Id. at 72. White, a female, worked for the defendant railroad as a forklift operator. After several sexual harassment and discriminatory incidents, White filed two claims with the EEOC. Three days after White's supervisor learned of the second EEOC claim, White was suspended without pay for "insubordination." The railroad later determined that White had not been insubordinate and reinstated her. The Supreme Court stated that the significance of any given act of retaliation will often depend upon the particular circumstances. Id. at 69. White's lost and delayed wages were sufficient to demonstrate that a reasonable person might be dissuaded from making a charge of discrimination. Id. at 72.

In White v. Baxter Healthcare Corp., 533 F.3d 381, 406 (6th Cir. 2008), the Sixth Circuit held that the plaintiff 's allegedly downgraded performance evaluation was an adverse employment action because the plaintiff testified that he would have received a higher pay

increase had he received a higher performance evaluation.  His salary increase would have been 3% with a better evaluation, but with the downgraded performance evaluation, he received a 2% increase.  The court concluded that the plaintiff produced enough evidence to create a genuine issue of material fact as to whether the downgraded performance evaluation had an adverse impact on salary and reversed summary judgment.  Id. at 411.

Arnold's claim is analogous to those at issue in Burlington Northern and White because Arnold's hours were cut to 25 per week in September 2011, effectively reducing her wages. This reduction occurred shortly after Dierig and Klick were notified of Arnold's EEOC charge on August 23, 2011.  When Arnold asked why her hours had been cut, Klick told Arnold she was originally hired to work 25 hours per week.  However, Arnold testified that she was hired to work 30 hours per week, year-round and had always worked at least that many hours prior to September 2011.  The resulting reduction in hours caused a material decrease in her wages which constitutes an adverse employment action.  Viewing the facts in a light most favorable to the plaintiff, Arnold has made out a prima facie case of retaliation.

The burden of proof then shifts to the defendant to offer a legitimate, non-retaliatory reason for that action.  Sportservice states that Arnold's hours were reduced because it was the end of the baseball season and all hourly employees' hours were cut due to the amount of business at that time of the year.  Further, Sportservice states Arnold's hours were limited because Meyer, in her new role, had assumed many duties that Arnold had temporarily held due to Shanor's reassignment.  These are legitimate, non-retaliatory explanations.  Arnold must therefore demonstrate that these reasons are pretext for unlawful retaliation.

In Pettit v. Steppingstone, Center for the Potentially Gifted, 429 F. App'x 524, 538 (6th Cir. 2011) (unpublished), the court affirmed summary judgment on a retaliation claim because

Pettit, a part-time employee at defendant's school, failed to produce sufficient evidence of pretext. Pettit was removed from her human resources duties shortly after she complained to her supervisor that she believed the school was violating the Fair Labor Standards Act. The defendant stated that Pettit's duties were changed because she failed to follow her supervisor's instructions. The school was experiencing a major enrollment crisis, and Pettit was told to focus solely on her admissions responsibilities. When Pettit continued working primarily on human resources issues, those duties were taken away. Pettit claimed this reason was pretextual because she had offered to work more hours in order to fulfill both the human resources duties and the admissions duties. The court concluded that this failed to show pretext because she did not address the defendant's rationale: the school was going through a crisis and plaintiff failed to focus on her admissions duties as directed. Id.

In Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 547 (6th Cir. 2008), the Sixth Circuit found that the district court properly denied the employer's summary judgment prior to trial. It held that Imwalle, an American working for a Swiss company, produced sufficient evidence for a reasonable jury to find that he had been retaliated against after his attorney wrote a letter to the company alleging that Imwalle had been discriminated against due to his age, and after he filed an EEOC charge a few months later. His employer claimed it had terminated him because of poor performance. Imwalle countered with evidence that he had managed one of the company's most successful divisions. He also presented evidence that the working environment became retaliatory after his attorney's letter and again when he filed his charge. He was removed from many meetings and responsibilities with little explanation. And, Imwalle's supervisor, Ott, specifically referred to his EEOC charge when he terminated Imwalle. The court found that this evidence of pretext was sufficient to show that retaliation was more

likely than not the motivation for Imwalle's termination.  Specifically, Ott's mention of the EEOC charge at the time of termination demonstrated that the charge was at "the forefront" of the decision.  Id. at 550.

Arnold's hours were reduced in September 2011 at the end of the baseball season. Sportservice asserts that all hourly employees' hours were cut due to the amount of business at that time of the year, and Arnold presented no evidence to the contrary.  In fact, Arnold conceded that all hourly employees received the September 20, 2011 letter concerning employee discipline for exceeding their assigned hours.  This letter is evidence of a general initiative at Sportservice to limit all employees' hours at the time Arnold's hours were reduced.

Arnold asserts that she had never been involved in offseason cuts before 2011 because she was a year-round employee, and because her original agreement with Shanor was to work 30 hours per week.  This fails to rebut Sportservices articulated reasons for cutting her hours. Arnold's hours remained lower after Meyer took over many of Shanor's old responsibilities and "as the company sought to unify its point of contact with the Reds."  (Doc. 20 at 19)  Arnold provides no evidence to refute this explanation.

Finally, Arnold relies on a myriad of perceived slights to demonstrate an atmosphere of retaliation.  Arnold was asked to not attend meetings that she had attended in the past and was not assigned to events she had worked under Shanor.  Sportservice maintains these changes occurred because Meyer had taken over many of Shanor's old responsibilities.  Arnold was uninvited to a year-end party, was taken off the RedsFest list, and did not receive a Christmas gift or card from Dierig as she had in the past.  But unlike Imwalle, there is no evidence that her EEOC charge played a role in these decisions, and the EEOC charge was never mentioned by the decision makers.  Nor do these incidents directly rebut Sportservice's legitimate, non-retaliatory

reasons for the reduction in hours.  In fact, Arnold's removal from meetings and events appears to support Klick's explanation that Sportservice wanted Meyer to be the exclusive point of contact with the Reds, and that some responsibilities in the office were changing as a result. Arnold has failed to carry her burden in proving that Sportservice's asserted, non-retaliatory reasons for reducing her hours were pretextual.

Arnold alternatively argues that she was constructively discharged.  Constructive discharge occurs when the employer, with discriminatory purpose, imposes working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would feel she had no choice but to resign.  Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996).  To show that she was constructively discharged, Arnold must produce evidence that Sportservice (1) deliberately created intolerable working conditions, as perceived by a reasonable person, (2) did so with the intention of forcing Arnold to quit, and (3) that Arnold actually quit.  Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir.1999).  "The test deliberately sets a high bar, as the law generally expects employees to remain on the job while pursuing relief from harassment."  McKelvey v. Sec'y of U.S. Army, 450 F. App'x 532, 535 (6th Cir. 2011) (unpublished) (internal quotations omitted).

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 568 (6th Cir. 2001).  Of these factors, Arnold appears to rely on (2) and (3).

Arnold's duties and responsibilities at Sportservice started to change in the fall of 2011. Arnold asserts that she was told to not attend certain meetings or communicate with clients and was removed from an email list. She also claims that Klick and Meyer did not assign her to additional events that Shanor had traditionally assigned to her. Sportservice maintains that these actions were taken because the company was trying to consolidate its point of communication with clients. In September 2011, Arnold's hours were reduced from 30 to 25 per week because of seasonal business needs.[1] This Court finds that a reasonable employee would not view these small changes in duties as so intolerable that the employee would have no choice but to resign. See Curtis v. Hanger Prosthetics & Orthotics, Inc., 101 F. App'x 61, 64-66 (6th Cir. 2004) (unpublished) (finding no adverse employment action where the company reduced its employees' responsibilities as part of an office reorganization). These changes occurred approximately twelve months before Arnold resigned which makes it even more unlikely that they forced her to resign. See, e.g., Geisler v. Folsom, 735 F.2d 991, 992–93, 996 (6th Cir.1984) (finding no constructive discharge when the employee did not resign until seven months after alleged retaliation).

In March 2012, Arnold was told she would be laid off for nine days. However, she was offered substitute work during that time and worked the normal number of hours.[2] Arnold believed this type of seasonal layoff was used to terminate employees but could not provide any examples to support her belief. Regardless, a fear of imminent termination cannot support a claim of constructive discharge. See Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not

---

[1] A reduction in hours can create hardship for a part-time employee, but this does not appear so intolerable that an employee would feel compelled to resign.

[2] To support her claim of constructive discharge, Arnold must also establish that Sportservice deliberately made conditions intolerable. It appears contradictory that Sportservice would offer Arnold a chance to avoid the seasonal layoff if Sportservice intended to cause Arnold to quit.

constructively discharged.").  Arnold's duties were different for nine days, but she does not suggest that the conditions were intolerable or even burdensome.

In July 2012, Arnold was disciplined for going over her allotted hours by 23 minutes. She was then reprimanded verbally for mistakes made during two events.  However, Arnold did admit to the underlying infractions, and the discipline file explicitly stated that Arnold would be removed from corrective counseling so long as she did not have any more incidents for six months.  This type of discipline does not support a claim of constructive discharge.  See Caslin v. Gen. Elec. Co., 696 F.2d 45, 47 (6th Cir. 1982) (holding that a poor performance review and placement on a three month performance improvement plan did not support a finding that the employer deliberately made plaintiff's working conditions intolerable).

Finally, Arnold asserts that she was isolated by Sportservice.  She claims that Dierig and Noel would not respond to her greetings, that she was uninvited to a year-end party, and was not given a Christmas gift or card.  However, these isolated incidents are not enough to support a claim of constructive discharge.  In KUKA Welding Sys., the Sixth Circuit found that Moore, an African-American, was constructively discharged when he was intentionally isolated.  171 F.3d at 1080.  A couple of weeks after Moore's EEOC complaint was filed, employees and supervisors began avoiding him and would not talk to him.  One supervisor instructed all of the other employees to move their belongings away from Moore's.  Finally, the two other employees who worked in Moore's section were reassigned causing him to work alone.  Arnold does not allege this type of intentional and pervasive isolation.  Keeping in mind the high bar for establishing a constructive discharge claim, Arnold has failed to show her working conditions were so intolerable that she had no choice but to resign.

Arnold's claim for retaliation fails as a matter of law.

**CONCLUSION**

For all of the foregoing reasons, the Court grants Defendant's motion for summary

judgment (Doc. 20) on Plaintiff's age discrimination and retaliation claims.

SO ORDERED.

THIS CASE IS CLOSED.

Dated:  July 16, 2013                          s/Sandra S. Beckwith
                                               Sandra S. Beckwith, Senior Judge
                                               United States District Court